*687 OPINION OF THE COURT
Mark H. Dadd, J.
On August 9, 1984, petitioner Ronald Brown was subjected to a disciplinary hearing at the Attica Correctional Facility. He was found guilty of using marihuana on the basis of two positive readings obtained pursuant to the Emit-st Drug Detection System. In this CPLR article 78 proceeding, petitioner challenges the reliability of this testing method, the proficiency of employees assigned to administer the test, and the adequacy of the foundation presented to admit the results into evidence. It is contended that such positive readings do not constitute substantial evidence of drug use in the absence of confirmation by an alternative method of analysis.
By agreement between the parties, this matter was consolidated with numerous pending petitions which challenge the validity of the drug-testing procedure utilized in disciplinary proceedings at the Attica Correctional Facility. Relief was granted in the prior lead case, Matter of Torres v Smith (index No. 13,162), when the respondents conceded that the test operator had failed to properly calibrate the instrument. By stipulation, the instant case was designated the lead case in presenting proof on the current procedure.
The respondents follow a testing procedure set forth in Department of Correctional Services Directive No. 4937 (Directive) dated December 1, 1983. The Emit-st (enzyme multiple immunoassay technique) system constitutes a qualitative measure of drug metabolites which should be present in a urine sample of a drug user. A urine sample with reagents and a reference or calibrator solution are placed into a photometer in separate vials for comparison of chemical reactions. The Directive sets forth specific procedures (such as maintaining the chemical within a temperature range) which must be followed to make a positive result reliable and indicates that medications may produce positive results in certain tests (see, appendix C). Forms are provided which operators use to record that the procedure was followed. These forms do not indicate what medications, if any, might introduce error in cases involving marihuana. There is no requirement that the operator be interviewed at the disciplinary proceeding or that the calibration records or daily log be shown to the inmate and made a part of the record.
Expert testimony was presented by Dr. Karl Verebey on behalf of the respondents and by Thomas Rejent on behalf of *688 the petitioner. Mr. Rejent was of the opinion that a legal penalty should not be imposed solely on the basis of the Emit-st test and that a positive result should be confirmed by a different analytical procedure. Dr. Verebey initially disputed this conclusion but admitted more accurate testing methods, such as gas chromotography mass-spectrometry, are available. Upon reexamination, he conceded that confirmation by alternative means is desirable in resolving legal disputes because of the financial feasibility of utilizing thin-layer chromatography to confirm the results. The manufacturer and distributor of the Emit-st test has apparently taken this position in its literature.
The respondents contend that accused inmates are given adequate protection by the procedure which requires that a positive reading be confirmed by a second Emit-st test run by a different operator. The Daily Emit Drug Detection System log (log) for the test performed on petitioner’s urine was introduced into evidence. The log indicates that 20 tests were run on urine samples on July 27, 1984, and that eight specimens yielded positive results. Of the eight which initially tested positive, only three yielded positive results in the second operator’s test. It appears that the result reached by the Emit-st system on eight samples by these operators was duplicated upon retest only 37.5% of the time. This court is of the opinion that such an inconsistent result raises serious doubts about the reliability of the test, at least when it is conducted by nontechnical personnel.
The Assistant Attorney-General has speculated that the inconsistent results revealed in the log might be explained by the exposure of the samples to air. He theorizes that this might reduce the concentration of metabolites in the specimens and lead to a negative reading upon retesting. This court finds no support for this theory in the record. The possibility of this resulting from the level of the operative chemical in the reference solution, which was suggested by Dr. Verebey, is similarly unconvincing. It seems fundamental that a test procedure cannot be called reliable unless one can expect with a reasonably high statistical certainty that the same result will be achieved in successive tests on the same sample. In this instance, how can a hearing officer be confident that 1 or 2 of the 3 remaining positive readings on July 27, 1984 would be duplicated if tested a third time?
Testimony was also given by Jim Burke and John Dickey, the two correction officers who operated the Emit-st system *689 when petitioner’s urine ample was analyzed. The officers indicated that it was not "unusual to have wildly varying results with the same sample”. Indeed, close inspection of the July 27, 1984 log confirms this testimony. Although afforded more than an adequate opportunity, respondents have not produced any evidence of a statistical nature showing the reliability of the Emit-st test when performed on site by nontechnical Department of Correctional Services employees.
The record is also devoid of any indication that the hearing officer, the employee taking the test sample, or the test operators were informed about what medications might possibly undermine the test’s accuracy. Therefore, the Directive’s requirement that the employee taking the urine sample list the medications taken by the inmate appears to be meaningless.
The expert testimony conflicted on the likelihood that ingestion of other drugs such as aspirin might produce false positive readings. Based on this testimony, the court is of the opinion that it is very unlikely that ingestion of drugs at levels normally prescribed is a large source of error in the Emit-st system. There appears to be only a remote chance that another drug might trigger a positive reading for the presence of marihuana.
In light of the testimony adduced by this court, including the opinions of the experts and the court’s knowledge of the fact that the hearing officer used the test result in the Torres case (supra) despite the improper calibration of the device, this court is of the opinion that the current testing procedure is not sufficiently reliable to justify the imposition of a disciplinary penalty on the sole basis of two positive readings using the Emit-st system. In order to meet the substantial evidence standard applicable to such hearings, a positive reading should be confirmed by an alternative analytical method and at least one of the operators should be interviewed by the hearing officer (see, Matter of Jones v Smith, 120 Misc 2d 445 [1983], affd 101 AD2d 705; People ex rel. Corcoran v Smith, 105 AD2d 1142 [1984]).
The record also indicates that an incomplete foundation was laid for the hearing officer’s acceptance of the test results. The transcript does not establish that the records of the calibration test or the log sheet were shown to the inmate. Although the hearing officer interviewed one of the test operators in a summary fashion and played a tape of the conversation to the *690 inmate, the petitioner was not afforded an opportunity to propose questions for the hearing officer to relay to the witness. Indeed, it is hard to imagine what questions petitioner could have raised to challenge the evidence used against him without notice of the nature of the test and the specific procedure used in this case.
It is this court’s conclusion that the inmates in such disciplinary actions should be served with a copy of the Directive and its appendices, as well as a copy of the calibration and records and daily log. The inmate should also be given an opportunity to present questions indirectly to the operator who is interviewed by the hearing officer.
Now, therefore, it is hereby ordered that respondents are to nullify the disciplinary hearing held on August 9, 1984 and to expunge any reference to that hearing from institutional records.