OPINION OF THE COURT
Simons, J.
The issue presented in each of these seven prison disciplinary proceedings is whether the results of Syva Emit-st Drug Detection System Tests, known as EMIT tests, can constitute substantial evidence to support respondents’ determination finding an inmate guilty of violating a rule prohibiting the use of a controlled substance. We hold that in each case the positive results of an EMIT test, when confirmed with the results of a second EMIT test, constitutes substantial evidence to support the determination. Accordingly, in each proceeding the judgment of the Appellate Division annulling respondents’ determination should be reversed and the petition dismissed.
In each of these disciplinary proceedings, the petitioner was charged with violating inmate rule 113.12 (7 NYCRR 270.1 [b] *139 [14] [iv]), prohibiting the use of narcotics. In support of the charges, respondents relied on the positive results of two EMIT tests performed on the petitioners’ urine. The results were admitted into evidence based on a documentary foundation consisting of a request for urinalysis test form, a urinalysis procedures form, a printed result card produced by the testing apparatus and a report prepared by the manufacturer of the EMIT test, explaining the nature of the test, its limitations and its reliability. In the reliability section of the report, it is stated that the Center for Disease Control in Atlanta, Georgia, has conducted surveys since 1972 on the reliability of the different analytical methods of drug testing. Specifically, the report states that "Emit tests have been shown to be among the most consistently accurate drug testing methods in current use” with recently published data showing that the percentage of correct results from EMIT tests ranged from 97% (for amphetamines, barbiturates, morphine and phencyclidine) to 99% (for cocaine and methadone).
In Lahey, Gatson, Wiggins, Green and Reid, the inmate misbehavior report specifies the suspicious activity or circumstance that warranted the imposition of the drug test. For example in Lahey, the report states that the inmate was requested to submit to a urinalysis test after he and four other inmates were seen by a correction officer smoking and passing what appeared to be a marihuana cigarette. In McClanahan and Carrion, the misbehavior report states that the test was performed as a routine matter following petitioner’s participation in the Family Reunion Program.* [1] 2Each petitioner was permitted to introduce evidence at a prison disciplinary hearing in an effort to explain the positive tests results. Several of the inmates stated that they were taking other medications and suggested that this may have caused the positive test results. Respondents found each petitioner guilty of violating the rule and assessed penalties ranging from 30 days keeplock and loss of phone privileges to four months loss of participation in the Family Reunion Program.
*140 Petitioners thereafter commenced these article 78 proceedings seeking to annul the determinations. In Lahey, Gatson, Wiggins, Green and Reid, Supreme Court, Wyoming County, granted the petitions and expunged from the record any reference to the alleged violation of the drug use rule. In Carrion and McClanahan, Supreme Court transferred the proceeding to the Appellate Division, Fourth Department.
Considering each case as if it had been properly transferred pursuant to CPLR 7804 (g), the Appellate Division, Fourth Department, annulled the determinations and expunged any reference to the alleged drug use from petitioners’ records, stating in the lead case Matter of Lahey v Kelly, that the record contained insufficient evidence to establish the reliability, and thus the admissibility of the EMIT test results. Because the Fourth Department and the Third Department (see, Matter of Vasquez v Coughlin, 118 AD2d 897) had reached different results on the use of EMIT tests, we granted respondents leave to appeal.
It is well established that in order to annul an administrative determination made after a constitutionally required hearing a court must be satisfied, after reviewing the record as a whole, that the record lacks substantial evidence to support the determination (Matter of Berenhaus v Ward, 70 NY2d 436; People ex rel. Vega v Smith, 66 NY2d 130, 139; 300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 180; CPLR 7803 [4]). "While the quantum of evidence that rises to the level of 'substantial’ cannot be precisely defined, the inquiry is whether 'in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs’ ” (People ex rel. Vega v Smith, supra, at 139, quoting National Labor Relations Bd. v Remington Rand, 94 F2d 862, 873).
In each of these cases, the results of the EMIT drug tests were the sole evidence used to support the ultimate conclusion that the inmate had used illegal narcotics. Thus, to determine if there is substantial evidence to support the determinations it is necessary to examine the reliability of the EMIT drug test.
EMIT is an acronym for enzyme multiple immunoassay technique. An EMIT test does not measure the amount of drugs in the urine directly, but instead measures the reaction of an enzyme to a specified drug. The major advantages of the EMIT test are that it is quick, relatively inexpensive, and can *141 be operated by people who are not scientific experts. The system works on a biochemical principle. Certain antibodies are added to the urine specimen and the reactions which result produce a substance which can be compared to known values through a device known as a photometer. Within 90 seconds the photometer prints on the result card whether the sample is positive or negative for the drug in question. If the initial EMIT test turns up negative, no further action is taken. If, however, the test results are positive, a second test is conducted. If the second test is also positive then a misbehavior report charging a violation of rule 113.12 is prepared by the correction officer who performed the second test.
Petitioners’ concession that they challenge neither the right nor the duty of the Department of Correctional Services to use the EMIT test to address the serious problem of narcotics abuse in State correctional facilities helps to frame the issue. Essentially, petitioners argue that although EMIT tests may be employed in prison disciplinary proceedings, unless the positive tests results are confirmed with an independent method of drug testing, they do not constitute substantial evidence to support a determination that an inmate has violated the rule against using narcotics.
To determine reliability of the EMIT tests, we turn first to the most recent litigation involving their use, the Federal action of Peranzo v Coughlin.
In 1984, inmates subject to the jurisdiction of the New York State Department of Correctional Services filed a class action in the United States District Court for the Southern District of New York, alleging that EMIT urinalysis drug testing was so unreliable that use of such results as the sole evidence of guilt in disciplinary proceedings was a violation of due process of law. Each of the petitioners on these appeals was, as a member of the class, a plaintiff in the Federal action.[2] Initially, the District Court denied the plaintiffs’ motion for a preliminary injunction and denied defendant correction officials’ cross motion to dismiss the complaint for failure to state a claim upon which relief could be granted (Peranzo v Coughlin, 608 F Supp 1504). Instead, the court requested that a study of the reliability of EMIT testing, as performed by the Department of Correctional Services be undertaken. Such *142 studies were conducted and the results completed and based upon the conclusions of the report, District Court granted the Department’s motion for summary judgment and dismissed the Peranzo action (Peranzo v Coughlin, 675 F Supp 102, Sand, J.).
The study of the New York State Department of Correctional Services’ procedures for testing urine samples was conducted under the auspices of the American Association of Bioanalysts (AAB). In this study participants such as the New York State Department of Correctional Services rehydrated dried urine samples provided by the AAB, tested the samples, and returned their findings to the AAB. The AAB knew prior to sending out the samples whether they contained drugs, and thus could monitor the reliability of the participants’ testing procedures. In the Peranzo action, the Department of Correctional Services submitted to the court the results of some 3,067 proficiency tests performed by Department of Correctional Services personnel, including 730 tests in which a Department facility had found some specified drug to be present. In only nine instances did a facility find a drug to be present when the reference laboratory found it "absent”. These proficiency reports indicated that Department of Correctional Services facilities have an accuracy rate of over 99.7%, if one considers all 3,067 tests, or of 98.7%, if one considers only the 730 positive tests. Based upon this study the District Court held that the results of an EMIT test, when confirmed with a second EMIT test or its functional equivalent, were sufficiently reliable to satisfy Federal due process guarantees; use of an alternative testing method to confirm the positive EMIT test was not required.
The results of the AAB study are persuasive because they relate specifically to the New York State correctional facilities and confirm the approach taken by the overwhelming majority of State and Federal courts which have considered the reliability of the EMIT drug test results (see, e.g., Spence v Farrier, 807 F2d 753, 756 [8th Cir] [EMIT test, with a confirmatory second EMIT or other test, contains sufficient indicia of reliability to provide evidence of drug use]; Harmon v Auger, 768 F2d 270, 276 [8th Cir] [EMIT test results are "about 95% accurate” and form a sufficient basis for disciplinary action]; Wykoff v Resig, 613 F Supp 1504, 1512 [ND Ind] [a positive EMIT test confirmed by a second Emit test or its equivalent satisfies due process]; Jensen v Lick, 589 F Supp 35 [D ND] [unconfirmed EMIT test results satisfy due process]; *143 see also, Hoeppner v State of Iowa, 379 NW2d 23, 25 [Iowa App]; Smith v State, 250 Ga 438, 298 SE2d 482). Although some lower courts have taken a different view concerning the reliability of the EMIT tests, those cases, as noted by the dissent below, are factually distinguishable because most involve a single unconfirmed test (e.g., Higgs v Wilson, 616 F Supp 226 [WD KY], vacated sub nom. Higgs v Bland, 793 F2d 1291; Wilson v State, 697 SW2d 83 [Tex Ct App]; Kane v Fair, 33 Crim L Rptr 2492 [Mass Super Ct]). When two tests are performed on the same sample, as was done in the cases before us, the results are significantly more reliable (see, Higgs v Wilson, supra, at 231).
It is also important to note that in determining the reliability of the EMIT tests, we are only concerned with false positives, not false negatives. Otherwise stated, if one or both of the two drug tests fail to reveal the presence of a controlled substance, even though inmates have actually used drugs, the inaccuracy of the test does not work any injustice against them. It is for this reason that the results reported in Matter of Brown v Smith (132 Misc 2d 686), upon which the trial court relied in some of these cases, are misleading. In Brown, Supreme Court, Wyoming County, examined the log of urine tests run at Attica Correctional Facility on July 27, 1984. Out of 20 urine samples tested eight specimens yielded positive test results after the first test. Of these eight only three yielded positive results in the second operator’s test. Thus, Supreme Court found the test was unreliable because positive test results reached on the first test were duplicated only 37.5% of the time. No disciplinary action resulted in those cases, however, because the Department requires two positive results before disciplinary action based solely on the results of the EMIT tests can be instituted. There were no statistics reported in Brown which supported the trial court’s conclusion that when two tests conducted by Department officials turn up positive, there remains a measurable chance that the inmate did not use drugs (see, Peranzo v Coughlin, 608 F Supp 1504, 1512, n 14, supra).
Based upon the AAB study reported in the Peranzo litigation, and the overwhelming acceptance of the reliability of the EMIT test when confirmed with a second test, we hold that positive EMIT test results when confirmed by a second EMIT test or its equivalent, are sufficiently reliable to constitute substantial evidence to support a determination by respondent that an inmate has used illegal drugs.
*144 Petitioners contend that the results of the EMIT tests should not be admissible in these proceedings because the State did not prove the reliability of the tests before Special Term or in any of the various disciplinary hearings. The Appellate Division, ruling before the Peranzo decision (675 F Supp 102, Sand, J., supra), agreed. Neither expert testimony nor detailed findings by the scientific community are essential before scientific tests or procedures are recognized, however. The court may find scientific tests reliable based on the general acceptance of the procedures as shown through legal writings and judicial opinions (see, People v Middleton, 54 NY2d 42, 49-50 [bite mark evidence]; People v Magri, 3 NY2d 562, 566 [radar]). We find both the Peranzo studies and the opinions of several other courts which have passed on the reliability of the Syva Emit-st Drug Detection System Tests persuasive and conclude such tests may be used to discover drugs in the body.
Finally, petitioners offer an alternative ground for affirmance. They argue that they were deprived of due process because the inmate misbehavior report did not specifically apprise them of the exact time and place that they allegedly used marihuana and thus gave them no ability to prepare an adequate defense. More accurately, petitioners contend that the rule which prohibits the use of controlled substances can only be enforced if in fact a correction officer or other inmate testifies or states in a verified report that the accused was actually seen using drugs at a certain time and place. As a practical matter, acceptance of such an argument would defeat the purpose of respondents’ drug testing program — enacted because detection of drug use by existing methods was deemed inadequate to meet a pressing drug problem in correctional facilities. When the substantive offense prohibits drug use generally, due process does not require that the inmate be informed of the exact time and place that he allegedly used the illegal drugs (see, Harmon v Auger, 768 F2d 270, 276, supra; Smith v Rabalais, 659 F2d 539 [5th Cir]). Even without such specific notice an inmate can still present an adequate defense by offering an explanation for the results, as several did here when they claimed the result was caused by use of a prescribed medication; can challenge the procedures followed in performing the test; and can challenge whether the test was authorized under the grounds stated in 7 NYCRR 1020.4.
Accordingly, the judgments of the Appellate Division in *145 each proceeding should be reversed, without costs, and the petitions dismissed.
Chief Judge Wachtler and Judges Kaye, Alexander, Ti-tone, Hancock, Jr., and Bellacosa concur.
In Matter of Lahey v Kelly: Judgment reversed, etc.
In Matter of Gatson v Kelly: Judgment reversed, etc.
In Matter of Wiggins v Kelly: Judgment reversed, etc.
In Matter of Green v Kelly: Judgment reversed, etc.
In Matter of Reid v Kelly: Judgment reversed, etc.
In Matter of Carrion v Kelly: On review of submissions pursuant to section 500.4 of the Rules of the Court of Appeals (22 NYCRR 500.4), judgment reversed, etc.
In Matter of McClanahan v Kelly: On review of submissions pursuant to section 500.4 of the Rules of the Court of Appeals (22 NYCRR 500.4), judgment reversed, etc.

. Generally, 7 NYCRR 1020.4 authorizes urinalysis tests of inmates if (1) the staff has reason to believe an inmate has ingested drugs or alcohol, (2) when an inmate is observed or found in possession of drugs or alcohol, (3) when the staff receives reliable information the inmate is under the influence of drugs or alcohol, (4) when an inmate returns from furlough, a family reunion visit, community services or an outside work detail or (5) is part of a random testing program of the facility or a unit or program area of the facility.

. The Attorney-General has not claimed that the Federal decision has res judicata effect in these proceedings and, therefore, we do not decide the issue.