2000 SD 79

Eugene F. GOEBEL, Claimant
and Appellant,

v.

WARNER TRANSPORTATION,
Employer and Appellee,

and

Dakota Truck Underwriters,
Insurer and Appellee,

and

J.W. Hutton, Inc., Intervenor.

No. 21185.

Supreme Court of South Dakota.

Considered on Briefs April 24, 2000.

Decided June 14, 2000.

Thomas M. Issenhuth of Arneson, Issenhuth & Gienapp, Madison, for claimant and appellant.

Susan Brunick Simons of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for Employer, Insurer and appellees.

GILBERTSON, Justice

[¶ 1.] Eugene Goebel (Goebel) appeals the circuit court's order denying his claim for worker's compensation benefits. The Department of Labor (Department) and the circuit court found Warner Transportation (Warner) had met its burden of proving SDCL 62–4–37 barred Goebel's claim. We affirm.

### FACTS AND PROCEDURE

[¶ 2.] On June 12, 1993, Goebel left Sioux Falls, South Dakota, to drive a semi-truck for his employer, Warner, to Salinas, California, where he arrived on June 15. After completing his duties in Salinas, Goebel was off-duty for approximately ten hours.

He and some other drivers obtained a hotel room. He did not sleep during that time. Goebel left Salinas at approximately midnight on June 16, 1993 and drove through Nevada and Wyoming. According to his "Driver's Daily Log," Goebel slept for eight hours between Las Vegas and Mesquite, Nevada on June 16. On June 17th, Goebel slept four hours between Mesquite and Rawlings, Wyoming. Goebel slept for approximately four hours in Laramie, Wyoming, before continuing his journey. Upon reaching North Platte, Nebraska, Goebel stopped for one-half hour to shower. His next stop was at a rest area approximately fifteen minutes outside of Grand Island to use the restroom. At approximately 4:50 a.m., Goebel's truck left the paved surface of Interstate 80 about five miles outside of Grand Island, Nebraska, and hit a bridge rail, rolling onto the driver's side, and eventually coming to rest in the interstate median ditch. It appeared to law enforcement that the truck had simply drifted off the road and tipped over, as there was no evidence of braking or skid marks present on the pavement.

[¶ 3.] Goebel had to be removed from the truck by rescue personnel, as there was extensive damage to the driver's side of the truck's cab. He was taken to a Grand Island hospital, where he was alert and awake, although he could not remember what happened since his stop at the rest area. Goebel complained of neck pain and stated he could not feel or move his lower extremities. He was diagnosed with a closed head injury, a C6–7 fracture (fracture of the sixth and seventh cervical vertebrae of the neck), with C6 quadriplegia and a compound fracture of the left shoulder. Thus, Goebel, 36 years old at the time of the accident, has been rendered a quadriplegic with no possibility of physical recovery to his lower extremities.

[¶ 4.] While medical staff were evaluating Goebel, an implied consent form was read to him so that a blood sample could be taken for the purpose of ascertaining the presence of any alcohol.[1] The results of this test were negative.

[¶ 5.] A urinalysis was subsequently requested and taken when a member of the rescue team at the scene of the accident found a black wallet which contained drug paraphernalia, including a small mirror, razor, spoon and a small brown vial containing a white powdery substance. A field test indicated the substance was methamphetamine. The wallet was found when law enforcement requested rescue personnel to search the truck, to look for identification of the accident victim, as Goebel's identity was not known at that time.

[¶ 6.] The urine sample was analyzed by the Nichols Institute, which utilized testing protocols established by the United States Department of Transportation. The testing showed a positive result for the drugs methamphetamine and marijuana. These two drugs are illegal, controlled substances pursuant to 21 C.F.R. § 1308.11, and classified as Schedule I drugs which are specifically prohibited by the DOT Federal Motor Carrier Safety Regulations Handbook. Goebel eventually admitted to smoking one marijuana cigarette on June 11, 1993, before beginning his trip to California, and snorting 1/10th of a gram of methamphetamine at midnight on June 15, 1993, while waiting for his truck to be loaded in Salinas. He had purchased $25.00 worth of methamphetamine while in Salinas.

[¶ 7.] Goebel brought a claim for worker's compensation benefits before the Department. Warner denied liability for his injuries, claiming SDCL 62–4–37 barred compensation because Goebel's illegal drug use was a substantial factor contributing to

---

1. Sergeant Ron Ochsner of the Hall County Sheriff's department testified that according to Nebraska law, if it appears an accident will result in "a fatality or [you] feel you're going to have one you need to draw blood." According to Ochsner, Goebel's injuries "were quite serious to the point where I felt we possibly could have a fatality."

his accident and resulting injuries. Warner presented the expert testimony of Dr. Michael Evans, a board certified toxicologist at the American Institution of Toxicology in Indiana, who testified that to a reasonable degree of scientific probability, Goebel's use of methamphetamine and marijuana impaired his driving ability, and that the impairment was a substantial factor in his accident.

[¶ 8.] Dr. Paul Pentel, Director of the Division of Clinical Pharmacology and Toxicology at the Hennepin County Medical Center in Minnesota, testified on behalf of Goebel. He testified impairment could not be determined solely from the positive urine drug test, stating there was not enough information available to form a credible conclusion as to whether Goebel was in fact impaired at the time of the accident.

[¶ 9.] The Department entered its decision and an order and findings of fact and conclusions of law on February 10, 1999, finding Warner, as a matter of law, had met its burden in proving Goebel's illegal use of Schedule I drugs was a substantial factor in the cause of the June 18, 1993 accident. Goebel appealed to the Hughes County Circuit Court which affirmed the Department's decision. Goebel appeals, raising three issues which can be consolidated into one:

> Whether the Department and the circuit court erred in finding that illegal drug use was a substantial factor in causing Goebel's injuries.

## STANDARD OF REVIEW

[¶ 10.] Our standard of review pursuant to SDCL 1–26–36 requires us to give great weight to the Department or hearing examiner on factual questions. *Sopko v. C & R Transfer Co., Inc.,* 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228 (citing *Helms v. Lynn's, Inc.,* 1996 SD 8, ¶¶ 9–10, 542 N.W.2d 764, 766; *Finck v. Northwest Sch. Dist.* No. 52–3, 417 N.W.2d 875, 878 (S.D.1988)). This Court reviews agency findings in the same manner as the circuit court in deciding whether they were clearly erroneous in light of all the evidence. *Id.* (citing *In Matter of Northwestern Bell Tel. Co.,* 382 N.W.2d 413, 415 (S.D.1986)). Only if after a review of the entire record we are definitely and firmly convinced a mistake has been committed will we reverse. *Id.* (citing *Spitzack v. Berg Corp.,* 532 N.W.2d 72, 75 (S.D.1995)) (citing *Day v. John Morrell & Co.,* 490 N.W.2d 720, 723 (S.D.1992)). When the issue is a question of law, the actions of the agency are fully reviewable. *Kester v. Colonial Manor of Custer,* 1997 SD 127, ¶ 15, 571 N.W.2d 376, 379 (citing *Loewen v. Hyman Freightways, Inc.,* 1997 SD 2, ¶ 6, 557 N.W.2d 764, 766) (citing *Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 357 (S.D. 1992); *Egemo v. Flores,* 470 N.W.2d 817, 820 (S.D.1991)). "We review the findings based on deposition testimony and documentary evidence under a de novo standard of review." *Id.* ¶ 15, 571 N.W.2d at 380 (citing *Hanten v. Palace Builders, Inc.,* 1997 SD 3, ¶ 8, 558 N.W.2d 76–78) (citing *Caldwell,* 489 N.W.2d at 357). "Likewise, mixed questions of fact and law which require the application of a legal standard are fully reviewable." *Egemo,* 470 N.W.2d at 820 (other citations omitted).

## ANALYSIS AND DECISION

[¶ 11.] **Whether the Department and the circuit court erred in finding that illegal drug use was a substantial factor in causing Goebel's injuries.**

[¶ 12.] Goebel challenges the Department's finding that his use of illegal Schedule I drugs was a substantial factor in causing the accident that led to his injuries. SDCL 62–4–37 provides that injuries caused by the use of Schedule I or Schedule II drugs are not compensable:

> *No compensation shall be allowed for any injury or death due to the employee's willful misconduct, including intentional self-inflicted injury, intoxication,*

*illegal use of any schedule I or schedule II drug,* or willful failure or refusal to use a safety appliance furnished by the employer, or to perform a duty required by statute. *The burden of proof under this section shall be on the defendant employer.* (emphasis added).

[¶ 13.] Under SDCL 62–4–37, Warner has the burden to prove Goebel's injuries were due to the illegal use of methamphetamine and marijuana. *Therkildsen v. Fisher Beverage,* 1996 SD 39, ¶ 11, 545 N.W.2d 834, 836. The words "due to" in SDCL 62–4–37 refer to proximate cause. *Id.* ¶ 13, 545 N.W.2d at 837 (citing *Driscoll v. Great Plains Marketing Co.,* 322 N.W.2d 478, 479 (S.D.1982)). This Court stated in *Driscoll:*

> When an injury may have had several contributing or concurring causes, the correct standard against which cause is measured is the substantial factor test and not a 'but for' test. 'When there is evidence of concurring or contributing causes, the trial court is required to apply the proximate causation standard expressed in South Dakota Pattern Jury Instructions[.]'
>
>> When the expression 'proximate cause' is used, it means that cause which is an immediate cause and which, in natural or probable sequence, produced the injury complained of. It is a cause without which the injury would not have been sustained. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.

322 N.W.2d at 479 (quoting *Leslie v. City of Bonesteel,* 303 N.W.2d 117, 120 (S.D.1981))(other citations omitted).

*Id.*

[¶ 14.] Evidence regarding the presence of methamphetamine and marijuana was submitted through the urinalysis test results, experts' opinions regarding the effects such illegal drugs would have on driving abilities, and the circumstances surrounding the accident itself.

[¶ 15.] An initial screen of Goebel's urine sample was performed by a procedure known as Enzyme Immunoassay.[2] This screen showed a positive result for the classes of drugs amphetamines and marijuana metabolites (THC). Once a positive result was obtained on the initial urine screening, a confirmation test was performed utilizing the "gold standard" for confirmation testing, known as the Gas Chromatography–Mass Spectroscopy test (GC/MS). This method tests for specific drugs, instead of general categories of drugs as with the EMIT. Dr. Evans explained that if a urine specimen first "screened positive for amphetamines, the GC/MS test would only look for methamphetamine and amphetamine ... [i]t looks for those two substances on the basis of molecular structure and the molecular fragmentation pattern they produce in the GC/MS." Dr. Evans testified the GC/MS test is "considered to be the gold standard and reliable in terms of accurate identification of those two [types of] drugs in [a urine] specim[e]n." [3]

---

2. The Enzyme Multiplied Immunoassay Technique (EMIT) is a standard screening method utilized by laboratories to ascertain if a urine sample contains any illegal substances. 47 Am.Jur. POF 3d 203, § 8. The test "does not measure the amount of drugs in the urine directly, but instead measures the reaction of an enzyme to a specified drug." *See Lahey v. Kelly,* 71 N.Y.2d 135, 524 N.Y.S.2d 30, 518 N.E.2d 924, 927 (1987) (discussing the reliability of the EMIT drug test to determine whether prison inmates had used illegal narcotics). "The system works on a biochemical principle. Certain antibodies are added to the urine specimen and the reactions which result produce a substance which can be compared to known values through a device known as a photometer. Within 90 seconds the photometer prints on the result card whether the sample is positive or negative for the drug in question." *Id.*

3. In fact, surveys have rated the GC/MS as "nearly infallible." *See Taylor v. O'Grady,* 888 F.2d 1189, 1192 n. 4 (7th Cir.1989) (citing Note, *Employee Drug Testing – Balancing*

[¶ 16.] Methamphetamine, a central nervous system stimulant, can initially produce hyperactivity, stimulation, apprehension and confusion. This particular amphetamine is commonly called "speed." Its effects are generally the same as other amphetamines, only markedly intensified. *See* The Sloane–Dorland Annotated Medical–Legal Dictionary 447 (1987); *People v. McCabe*, 49 Ill.2d 338, 275 N.E.2d 407, 412 (1971) (noting the potential for violence, paranoia and physical depletion are substantially more severe with methamphetamine). The effects of methamphetamine increase with the purity of the drug. Dr. Evans stated that "[a] highly pure substance is white in color ... [a]nd highly pure, meaning about 90 percent pure." The methamphetamine found in the brown vial in Goebel's truck was "snow white" in color.

[¶ 17.] The smoking of marijuana, a hallucinogen, alone can lead to impairment. Both Drs. Evans and Pentel agreed that impairment following the smoking of a single marijuana cigarette has been scientifically shown to exist 48 hours after the ingestion. THC, the principal psychoactive ingredient in marijuana, affects the mental thought processes of the individual, resulting in mental dullness, and lack of attention to detail in the post-euphoric phase, or the "down" phase. The Department found that "Dr. Pentel conceded that the articles he relied upon in reaching his conclusions stated that intoxication by marijuana at any age may be associated with appreciable impairment of motor driving skills." Expert testimony established that even a low dose of marijuana has been shown to result in impairment in driving skills.

[¶ 18.] Both experts in this case agreed that marijuana heightens the effect of dextroamphetamine,[4] or from amphetamines. In a clinical study performed by Dr. Evans,[5] to monitor the combined effects of marijuana and dextroamphetamine on humans, "the stimulation became excessive. Three of the subjects, out of the 15, became paranoid. Basically, what they did was grab ahold of my arm and said don't let go, because the trip was too strong for them. The stimulation, the height of the trip, was too strong in terms of heightening the effects." Thus, when put together, the two drugs can have very potentially dangerous effects on the human body during the "up" time of the "trip."

[¶ 19.] However, the bigger concern with combined marijuana and methamphetamine use relates to the depressive phase or "down" that follows the high. Dr. Evans testified, and Dr. Pentel agreed, that

the Interests in the Workplace: A Reasonable Suspicion Standard, 74 Va.L.Rev. 969, 989 and nn.127–130). The use of this test greatly reduces the chance of error in drug testing procedures. *See* Comment, *Drug Testing of Private Employees*, 16 U.Balt.L.Rev. 552, 556 (Spring 1987) (stating the GC/MS test is widely acknowledged as being more reliable). Moreover, the EMIT test, coupled with a confirmatory second test, such as the GC/MS, provides sufficiently reliable drug test results. *See Lahey*, 524 N.Y.S.2d 30, 518 N.E.2d at 928 (citing *Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir.1986) ([stating] EMIT test, with a confirmatory second EMIT or other test, contains sufficient indicia of reliability to provide evidence of drug use) (other citations omitted)). Goebel does not challenge the accuracy of the tests themselves, but disputes their lack of ability to determine level of impairment.

4. Dextroamphetamines and methamphetamines are both amphetamines. Dr. Evans explained that amphetamine is "much more potent" than dextroamphetamine. Dr. Evans conducted several clinical studies to evaluate the impairment effects of marijuana and dextroamphetamine "in humans with regards to psychomotor, mental motor, as well as the emotional or psychological state of the individual, the acute effects of that." Dextroamphetamine was used in the study because Dr. Evans "could not ethically and appropriately use methamphetamine ...," as it is not a drug made by a pharmaceutical manufacturer in this country. Instead, it is "made in a bathtub or in crack houses."

5. Dr. Evans performed this study as part of his thesis for his Ph.D., in 1974 in conjunction with the Indiana University School of Medicine and Toxicology.

the stimulant effect of methamphetamine wears off between 8 to 10 hours after ingestion, but this time period would be even shorter when the drug is inhaled, as Goebel so did. After the euphoric effect of the drug wears off, an individual feels extreme fatigue, exhaustion and sleepiness. Dr. Evans testified:

> There is very little impairment from [methamphetamine] when you are in the stimulant phase of the drug, in terms of motor impairment. It, actually, in some ways enhances skills, because it pushes off, or it prevents the fatigue from occurring. But once the drug wears off, you go into a depressed state, a depression type of state, and it involves fatigue, exhaustion, sleepiness, a strong urge to go to sleep. That's where the impairment concern is in terms of methamphetamine and driving.

[¶ 20.] The use of marijuana contributes to the depressive effect of the methamphetamine. Dr. Evans testified that the combination of the two drugs adds to the fatigue or exacerbates the fatigue which follows the euphoric phase of the methamphetamine. Dr. Pentel acknowledged the use of marijuana with methamphetamine was likely to exacerbate fatigue-related impairment. Further, when an individual has become tolerant to methamphetamine, meaning the user must ingest more of the drug to achieve the same effect, the depressive or "down" phase is likewise more marked. Dr. Evans testified, and Dr. Pentel agreed, that, in his opinion, Goebel had developed tolerance to methamphetamine, as a user of a tenth of a gram dose, that to an infrequent user could have been lethal.

[¶ 21.] Goebel claims the urine tests utilized in this case cannot conclusively indicate whether he was impaired at the time of the accident. Goebel's expert, Dr. Pentel, testified that [urine] "tests are not designed and are not capable of providing an answer about the drug having an effect, at the time the urine is collected." Goebel bases this argument on the "urine catch basin" theory, claiming that "the urine acts as a catch basin for the filtered drugs." Thus, Goebel argues, there is more drug in the urine, where it would have no impairing effect, than in the blood or brain. Thus, he claims the " 'catch basin' theory does not allow a credible determination of impairment based on the urine test alone."

[¶ 22.] Dr. Evans did not base his opinion that Goebel's drug use was a substantial factor in causing the accident solely on the urine test results. To the contrary, Dr. Evans agreed impairment cannot be determined solely from a positive urine drug test. However, he based his opinion on the known pharmacology of methamphetamine and marijuana, their known interactions and the effects they produce as well as the mechanics of Goebel's accident, all combined with the positive test result. Dr. Pentel did not disagree with Dr. Evans' methodology.

[¶ 23.] Moreover, our legislature in drafting SDCL 62–4–37 did not require any specific or particular types of tests to be used as a precondition to assert the illegal Schedule I drug use defense. The legislature could have required testing that would show a certain level of illegal drugs, as they have required to invoke the presumption in DWI cases in SDCL 32–23–7, but they have not made such a requirement. *See Graham v. Turnage Employment Group*, 60 Ark.App. 150, 960 S.W.2d 453, 455 (1998) (affirming the denial of worker's compensation benefits, and rejecting expert testimony concerning the inability of a urine test to determine whether marijuana had affected a person's capacity to function, when the legislature had set no specific testing requirements); *Brown v. Alabama Electric Co.*, 60 Ark. App. 138, 959 S.W.2d 753, 756 (1998).

[¶ 24.] The mechanics of the accident support the conclusion that Goebel's drug use was a substantial factor causing the accident that led to his injuries. Evidence at the scene of the accident indicated Goebel had simply "drifted off" the road into the ditch, because there were no skid marks or any indication he had abruptly

applied the brakes. Dr. Evans pointed to a scientific study by Dr. Barry Logan, a Washington toxicologist and member of the American Board of Forensic Toxicology. In this study, which the Department found was "[o]f particular relevance in this case," Dr. Logan examined the effect of methamphetamine use and driving accidents. He reviewed fatality cases over two years in the Washington State, and found that in 29 cases, the driver tested positive for methamphetamine. Out of those 29 cases, the driver also tested positive for marijuana. Dr. Logan examined the circumstances of the accidents, along with the behavior observed after the accidents and the presence or absence of drug paraphernalia at the scene. The Department found that "[a] number of the accidents in the Logan study involved the driver simply drifting off the road." Dr. Logan was able to conclude that the use of methamphetamine was a substantial factor in the accidents he reviewed based upon the available evidence, observable behaviors, the presence of drug paraphernalia, positive test results, plus the known pharmacology of methamphetamine. Dr. Evans testified that the facts of this case were consistent with the Logan case study investigation, in the types of accidents in which methamphetamine and marijuana played a factor. His testimony and opinion remained unrefuted at the hearing that Goebel's use of methamphetamine and marijuana was a substantial factor based upon the known pharmacology of the two drugs, their known interactions and the effects they produce, as well as the mechanics of the accident.

[¶ 25.] Shortly after the accident, Dr. Evans initially concluded that according to the scientific literature available at that time, Goebel had ingested both methamphetamine and marijuana within 72 hours of the collection of the urine specimen. However, by keeping current with scientific literature, in 1998 Dr. Evans was able to narrow the time frame and concluded that Goebel's consumption of marijuana had actually occurred within 48 hours of the urine test and that the methamphetamine was ingested within 12 hours prior to the urine collection. Dr. Evans explained he was able to amend his previous opinion based on new studies that had been published since 1993. Yet, his opinion remained intact that Goebel's drug use was a substantial factor in causing his accident.

[¶ 26.] Dr. Evans also explained that the presence of acidic urine (pH) results in a quicker excretion of methamphetamine out of the body system; therefore, an individual will test negative for the drug sooner if his urine is acidic. Goebel's urine pH level, which was noted at the same time the urine was screened, was 5.0. Dr. Evans testified that this fact makes it even more likely the methamphetamine was ingested 8 to 12 hours before the collection of the urine sample. The collection of the urine took place at approximately 8:00 a.m. on June 18, 1993, three hours after the accident. Thus, according to Dr. Evans' theory, Goebel most likely ingested the methamphetamine between 8:00 p.m. and midnight on June 17, 1993.[6] Therefore, Goebel's testimony claiming he inhaled the drug on June 15 was not consistent with the scientific testimony offered by Warner, and ultimately accepted by the Department and the circuit court.

[¶ 27.] Goebel spends many pages of his appellate brief criticizing Dr. Evans for his revised opinion, claiming that the reason for the "changed testimony" is "because of all the sleep that [Goebel] had within the 72 hours before the accident, Dr. Evans had to change his medical opinion in order to find impairment." His original conclusion that [Goebel] ingested the drugs within 72 hours, causing impairment, would not fit the facts of this case. As such, Evans simply changes his "expert" conclusions to fit the facts, all the

---

6. We know from studying Goebel's driver's log, he was off-duty from 7:00 pm to 8:00 pm on June 17. He also stopped at midnight in North Platte, Nebraska, to shower.

while, of course, "finding impairment." Basically, Goebel argues Dr. Evans' opinion should have been rejected by the Department for two reasons: (1) Dr. Evans' testimony regarding the "window" of ingestion of the illegal drugs changed from 1993 to 1998; and (2) Dr. Evans and the Department failed to consider the amount of sleep Goebel had between the ingestion of illegal drugs and the accident.

[¶ 28.] Both of these arguments fail. We can find no evidence in the record that Dr. Evans provided false testimony just to "fit the facts of this case." Dr. Evans amended his earlier opinion because new scientific literature directly on point to the facts of this case was published between 1993 and 1998, providing him with a basis, and a duty, to change his opinion based upon this new information. Dr. Evans cannot be criticized for remaining current with the scientific community and literature.

[¶ 29.] Second, while Goebel contests the findings of the Department and the circuit court that his drug use was a substantial factor in his accident, he does not provide any other explanation for the cause of the accident. Goebel strongly criticizes Dr. Evans and the Department for "failing to take into consideration [his] recent sleep patterns," for according to his sleep log, he slept 16 hours after ingesting the methamphetamine. He argues there could have been no fatigue to "push off" with the methamphetamine, if he had gotten 16 hours of sleep after taking it.

[¶ 30.] Goebel then reverses course and argues that possibly he was tired. He claims "Dr. Evans, the [Department], and the [c]ircuit [c]ourt all failed to find noteworthy that [Goebel] had been driving for eight and a half hours prior to his accident. Anyone that has ever taken a long trip by automobile knows that eight and a half hours behind the wheel can be exhausting." The evidence in this case, along with the Department's 213 findings of fact indicate Goebel was feeling fatigued, based on the known pharmacology of the combination of methamphetamine and marijuana,

the lack of skid marks at the scene, and Goebel's own testimony that he would use methamphetamine to "stay awake."

[¶ 31.] Whether or not Goebel had slept before the accident really does not change the fact that he still would have been experiencing the "down" stage of drug use. Again, pursuant to SDCL 62–4–37, Goebel's drug use need not be the only cause of his accident and resulting injuries, it need only be "a substantial factor" in causing the accident and injuries. *Therkildsen,* 1996 SD 39, ¶ 13, 545 N.W.2d at 837. Even if Goebel was tired due to driving, it would not preclude a finding that his use of methamphetamine and marijuana substantially heightened his fatigue. There is evidence that Goebel's ingestion of methamphetamine and marijuana impaired his ability to drive and caused the accident. Goebel's drug use "need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." *Id.* (citations omitted).

[¶ 32.] Both experts testified live at the worker's compensation hearing. Thus, deference must be given to the Department which had an opportunity to observe both experts' demeanors and weigh their credibility. *Kurtz v. SCI,* 1998 SD 37, ¶ 12, 576 N.W.2d 878, 883 (citing *Bonnett v. Custer Lumber Corp.,* 528 N.W.2d 393, 396 (S.D.1995)) ("Due regard shall be given to the opportunity of the agency to judge the credibility of the witness."). "Expert testimony is required when the subject matter at issue does not fall within the common experience and capability of a lay person to judge." *Caldwell,* 489 N.W.2d at 362 (citing *Podio v. American Colloid Co.,* 83 S.D. 528, 162 N.W.2d 385 (1968)). "In such a case the testimony of an expert is necessary to assist the factfinder in reaching a decision." *Id.*

[¶ 33.] The Department, as the trier of fact in this case, chose to accept Dr. Evans' opinion in making its decision, and

found that "[t]he facts support Dr. Evans' conclusions," and concluded that "Dr. Evans' opinion, to a reasonable degree of scientific probability, [establishes] that [Goebel's] use of methamphetamine was a substantial factor in the accident on June 18, 1993, is adopted as credible." "The trier of fact is free to accept all of, part of, or none of, an expert's opinion." *Johnson v. Albertson's*, 2000 SD 47, ¶ 26, 610 N.W.2d 449 (citing *Kester*, 1997 SD 127, ¶ 24, 571 N.W.2d at 380 (citing *Hanson v. Penrod Constr. Co.*, 425 N.W.2d 396, 398 (S.D.1988))).

[¶ 34.] The Department was also free to reject Goebel's testimony, when it found he was not a credible witness. The reviewing agency "is not required to accept the testimony of the claimant and is free to choose between conflicting testimony." *Id.* (citing *Wagaman v. Sioux Falls Constr.*, 1998 SD 27, ¶ 29, 576 N.W.2d 237, 242–43) (citing *Petersen v. Hinky Dinky*, 515 N.W.2d 226, 235 (S.D.1994)). There is substantial evidence to support the determinations of the Department and the circuit court that Goebel was not a credible witness. The Department found that "[Goebel's] testimony regarding the time he ingested methamphetamine and smoked marijuana is not credible." Goebel changed his testimony several times during the hearing. In his responses to Warner's Requests for Admissions, Goebel denied that the brown vial found in his truck after the accident contained methamphetamine. He later admitted the substance in the vial was in fact methamphetamine.

[¶ 35.] Goebel also initially testified that June 15, 1993 was the first time he had ever used methamphetamine. He then testified "I might have used it once before." Goebel again changed his testimony later in the hearing stating "I don't really recall how many times I have done it," and that it would be fair to say that his prior testimony that this had been the second time he ever used methamphetamine, may not have been accurate. Goebel was then able to estimate that he had "snorted" "one-tenth of a gram," or "just a line." When asked if he knew how many lines can be used out of a brown vial such as the one in his possession, Goebel replied "[w]ell, you know, it depends upon the size of the line.... You can have a big steak, or you can have a hamburger." Goebel's choice of terminology certainly does not indicate a naïve or casual user of drugs, and contributed to his lack of credibility. Both Goebel and his wife testified that he used amphetamines to keep himself awake while driving.

[¶ 36.] Thus, he recanted his previous testimony that he had used methamphetamine "just for fun [or recreational use]." Goebel's own words were "[w]e did [methamphetamine] to keep awake." The Department found that there were, at a minimum, two occasions when Goebel testified falsely under oath as to material facts—the issues of the timing of his ingestion and possession of methamphetmine, which the Department found to be "clearly relevant 'material facts in the proceeding.'" Pursuant to SDCL 62-7-40, "if the fact finder determines that any person testifying in the proceedings has knowingly [testified] falsely to any material fact in the proceeding, then the fact finder may reject all of the testimony of that witness."

[¶ 37.] When Goebel's own admissions are combined with the results of the urine tests, Dr. Evans, was able to rationalize that Goebel took enough drugs to reach a "high," enough drugs to obtain a stimulant effect, because "[h]e had an active amount of both drugs" in his system after the accident. Because "what goes up must come down," it can be inferred that Goebel was beginning to experience the "down" phase of the drugs at around the time of his accident. In fact, he testified that just outside of Grand Island he stopped to use the rest area, and at that time he was feeling "slightly" tired, but his "goal was to get to Grand Island."

[¶ 38.] Goebel, who had been a truck driver "off and on" since 1981, knew DOT

prohibited the use of controlled substances while operating a commercial vehicle such as a semi-truck. Yet Goebel disregarded that policy, and the law,[7] when he took methamphetamine and marijuana before driving across the country. He cannot now recover from Warner for injuries he sustained because of his own willful misconduct, when there is substantial evidence in this case to support the conclusion that his drug use was a substantial factor in causing his unfortunate accident.

[¶ 39.] The Department found that there was "no contrary expert opinion" as to the cause of the accident and found Goebel's drug use was indeed a substantial factor in causing his truck accident and injuries. The circuit court affirmed this finding. Given the Department's ability to judge the credibility of the witnesses in this case, we cannot say it was clearly erroneous in denying Goebel's worker's compensation benefits for his trucking accident. The findings of the Department that Goebel was lacking in credibility were not clearly erroneous, as we find substantial evidence to support its conclusions. The Department, as the trier of fact, was free to disregard Goebel's testimony, and entitled to give greater weight to Dr. Evans' testimony and opinions.

[¶ 40.] The decision of the Department is affirmed.

[¶ 41.] MILLER, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.

---

7. While Goebel's accident occurred in Nebraska, this Court notes this type of drug possession is illegal in South Dakota. SDCL 22–42–5 provides that possession of a controlled substance, such as methamphetamine, is a Class 4 felony. Possession of marijuana is also prohibited under SDCL 22–42–6. SDCL 22–42–15 provides:

"[a]ny person who intentionally ingests, inhales, breathes or otherwise takes into the body any substance, except alcoholic beverages as defined in § 35–1–1, for purposes of becoming intoxicated, unless such substance is prescribed by a practitioner of the medical arts lawfully practicing within the scope of their practice, is guilty of a Class 1 misdemeanor."

Finally, SDCL 22–42A–1 to 3 provides the use or possession of drug paraphernalia as a misdemeanor. Nebraska has nearly identical criminal statutes concerning controlled substances as does South Dakota.