#23657-a-DG

**2006 SD 35**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CHRIS HOLSCHER,                                        Claimant and Appellant,

  v.

VALLEY QUEEN CHEESE FACTORY,            Employer and Appellee,

 and

ACUITY INSURANCE,                                       Insurer and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

* * * *

HONORABLE ROBERT L. TIMM
Judge

* * * *

MARK J. FREEMAN of
Fitch, Johnson, Larson & Held, P.A.
Minneapolis, Minnesota                                   Attorneys for appellant.

SUSAN BRUNICK SIMONS
KRISTI GEISLER HOLM of
Davenport, Evans, Hurwitz & Smith, L.L.P.
Sioux Falls, South Dakota                               Attorneys for appellees.

* * * *

ARGUED JANUARY 11, 2006

OPINION FILED **04/05/06**

#23657

GILBERTSON, Chief Justice

[¶1.]    Christopher Holscher (Holscher), was injured on October 1, 2003, while working at Valley Queen Cheese Factory (Valley Queen). Valley Queen established willful misconduct on Holscher's part at a hearing before an administrative law judge (ALJ), and Holscher's workers' compensation claim was denied. Holscher appealed to the Secretary of the Department of Labor (Secretary), who affirmed the ALJ's ruling. Holscher's appeal of the Secretary's ruling in circuit court was affirmed. He appeals the circuit court's ruling. We affirm.

## FACTS AND PROCEDURE

[¶2.]    Valley Queen manufactures cheese and other related by-products at its plant in Milbank, South Dakota. Numerous chemicals are used in the manufacturing process, some of which are hazardous. Valley Queen houses several chemicals in a central location known as the sabre room, including both alkaline and acid-based chemicals. One of the hazardous chemicals housed in the sabre room is a strong acid known as AC-55-5 (red acid). It is a clear red liquid with a purple hue. Red acid causes chemical burns upon contact with skin. When mixed with chlorine or chlorinated chemicals, red acid forms a hazardous chlorine vapor or gas that smells of chlorine or mustard gas. Inhalation injuries include a burning taste, sneezing, coughing, and difficulty breathing. A chlorine-based chemical known as Ful-Bac is also used in the plant as a cleaning solvent.

[¶3.]    Red acid is dispensed into a barrel in the sabre room from a holding tank located above the room via a chemical line using a gravity-fed system. Smaller hand held containers are filled from the barrel in the sabre room and then transported to other locations in the plant for use in various production processes.

-1-

#23657

Valley Queen requires employees to use a spring-loaded valve installed on the chemical line leading to the barrel. The spring-loaded valve operates only if the handle is held open. When the handle of the spring-loaded valve is released, the chemical ceases to flow into the barrel. Employees attend mandatory training programs to learn and review how to use and dispense red acid and other chemicals used on-site in a safe manner.

[¶4.] In November 1995, Holscher began working for Valley Queen in a variety of capacities including that of a utility worker. As a utility worker, Holscher filled in for absent employees in a variety of positions. Holscher first filled in as a night supervisor sometime prior to 2003. He was eventually promoted to night supervisor in June 2003.

[¶5.] During his employment at Valley Queen, Holscher received safety training on chemical use and handling. Holscher received individual training from a prior night supervisor when he was moved to the position of utility worker, including how to properly fill red acid barrels in the sabre room. In February 1998, Holscher attended a chemical use and handling training session where it was stated that acid and chlorine should not be mixed, and that injury could result from the chlorine gas produced by the mixture. During the February 1998 training, he was asked to respond true or false to the following statement: "You should contact your plant safety coordinator any time you see a major chemical spill." Holscher responded that the statement was true.

[¶6.] Holscher attended two training sessions in 2003 on chemical handling. A session in January 2003 again reviewed the fact that chlorine and acid should not be mixed. At that training session, Material Safety Data Sheets (MSDS) for

-2-

chemicals were reviewed, that included information on how to safely remove chemical spills. The MSDS for red acid stated that large spills should be dammed and removed with a pump. Small spills and residue could be flushed with water into a sewer containment system. The training instructed that if the odor of gas were present, the area should be immediately evacuated and a member of the management team should be contacted. Proper chemical handling was also reviewed at the training session.

[¶7.] At a May 2003 training session attended by Holscher, a revised evacuation plan was reviewed that required evacuation and immediate contact with management in the event the odor of gas was detected in the building. MSDSs were reviewed as well at their location in the plant. The session also included a review of the fact that acid and chlorine should not be mixed due to the creation of dangerous chlorine gas, that employees should not attempt to identify chemicals simply by color, and that all written procedures should be followed.

[¶8.] In addition to training employees with the MSDSs, Valley Queen placed laminated tags on all containers that identified the chemicals contained. Posters were placed on the walls in the sabre room that identified the chemicals present in the room and their properties. According to the MSDSs provided by Valley Queen to its employees for Ful-Bac and red acid, neither chemical required a respirator as personal protective equipment. The MSDS for Ful-Bac also stated that spills and vapors should not be breathed, that a spill area should be evacuated and that personnel should not return until the vapors dissipated.

[¶9.] After Holscher began working at Valley Queen, but before the incident on October 1, 2003, chemical spills had occurred in the sabre room due to an

-3-

employee propping open the spring-loaded valve by using a barrel cap or other object to override the mechanism, which allowed chemicals to flow unattended. As a result, Valley Queen adopted a safety rule that prohibited using caps or other objects to prop open the spring-loaded safety valve. Valley Queen also posted signs immediately adjacent to the spring-loaded valve on the red acid barrel that read: "DO NOT PROP OPEN VALVE."

[¶10.] Valley Queen had occasion to enforce the rule and took steps to do so against another employee, Dave Cardwell (Cardwell). Sometime in 2002, Cardwell violated the safety rule and a chemical spill occurred. As a result of the violation of the safety rule, Cardwell was suspended from work for five days. Cardwell violated the rule on a second occasion that resulted in a second chemical spill, and Cardwell's employment was terminated as a consequence.

[¶11.] As a result of the chemical spills that resulted in Cardwell's discharge, Valley Queen instituted yet another safety policy in 2002. The policy limited the number of individuals who were permitted to access the red acid barrel and placed the duty for dispensing the chemicals in the sabre room with supervisors. A sign was posted on the acid barrel that articulated the new policy: "Chemical To Be Dispensed By Supervisor Only!"

[¶12.] Sometime prior to the incident on October 1, 2003, Holscher was working as the night supervisor. When his immediate supervisor, Lance Johnson, passed through and noticed that a cap had been used to prop open the spring-loaded valve on a red acid barrel located in another room in the plant known as the DOH room. Holscher was present in the room at the time, and therefore, Johnson did not consider the open valve to be unattended and no chemical spill resulted

from the incident. However, Johnson told Holscher that his action of propping open the spring-loaded valve was a violation of Valley Queen's policies. Holscher admitted to Johnson that he knew he violated the policy. Johnson told Holscher that since he was a supervisor he had to set an example for other employees and that Holscher would not be able to do so if he himself violated the safety rules and policies. Johnson then reminded Holscher of the incidents that led to Cardwell's termination. Johnson ultimately reprimanded Holscher orally for his violation of the safety rules and policies, and concluded that an oral reprimand was appropriate based on the fact that Holscher had been present in the room, had not left the valve unattended, and that no chemical spill had resulted. No written warning was issued and no further disciplinary action was taken at the time, as Johnson believed Holscher would not violate the policy again.

[¶13.] Approximately two weeks later, Don Rieger (Rieger), an employee under the supervision of Holscher while on the night shift, observed Holscher violate the do-not-lock-open rule in the sabre room. Rieger observed Holscher standing with his arms crossed and leaning against another barrel with the spring-loaded valve propped open, waiting for the acid barrel to fill. Rieger warned Holscher that his actions were a violation of the safety policy, and Holscher conceded in response that he was aware of the safety policy. Holscher related to Rieger that Johnson had caught him propping open the valve with a cap in the DOH room. Holscher told Rieger that he had understood from Johnson that he could prop open the spring-loaded valve as long as he remained in the room. Johnson would later testify that he did not recall telling Holscher that he could prop open the spring-loaded valve as long as he remained in the room.

[¶14.]	In 2003, the South Dakota Department of Environment and Natural Resources (SDDENR) required Valley Queen to install a plug in the drain in the sabre room floor in order to contain any major chemical spills that might occur when employees were not on site, or if a chemical barrel were to fail when it was unattended or the plant was closed.  On August 20, 2003, Valley Queen notified SDDENR that the drain plug had been installed.  Valley Queen issued a memorandum to employees that stated:  "Note:  If there is a noticeable amount of chemical on the floor or in the drain do not remove the drain plug!  Contact a supervisor for proper cleanup of the spilled chemical."

[¶15.]	On October 1, 2003, Holscher again violated the safety rule and propped open the spring-loaded valve on the red acid barrel in the sabre room.  After propping open the valve, Holscher left the room to attend to other duties and forgot that he had propped open the valve.  A major chemical spill of approximately forty to fifty gallons of red acid occurred as a result of Holscher's actions.

[¶16.]	At 8:15 p.m. employee, Daniel Berglund (Berglund), walked past the doorway to the sabre room during the course of his duties and noticed an unusual darkness in the room that caught his attention.  Berglund looked into the room, observed what he knew to be red acid on the floor, and noticed that acid was continuing to flow over the top of the unattended barrel.  From where he stood, Berglund could see that the spring-loaded valve had been propped open and that no one was present in the room.  Berglund was not wearing rubber boots at the time, and therefore, did not enter the room to stop the acid spill.  Instead, Berglund went to the lunch room to find Rieger whom Berglund knew to be wearing rubber boots, as rubber boots are not adversely affected by acid.  Berglund located Rieger in two

to three minutes, advised Rieger of the situation, and asked him to run to the sabre room with his boots and stop the flow of red acid. Rieger quickly left the lunch room and went to the sabre room.

[¶17.] Upon arriving at the sabre room, Rieger noticed a bluish haze in the room and observed liquid pooled on the floor. Rieger recognized the liquid as acid due to its red color and an odor he knew to be indicative of acid. Rieger did not detect the presence of any substance other than red acid when he arrived at the sabre room. Rieger then held his breath, carefully "tiptoed" across the room so as not to disturb the red acid on the floor, and removed the cap from the spring-loaded valve. Rieger then exited the room in the same manner, spending no more than ten to fifteen seconds in the sabre room. No more than three minutes had elapsed from the time Berglund had notified Rieger of the spill and the time Rieger stopped the flow of red acid.

[¶18.] Within eight minutes of Berglund's discovery of the acid spill, he was able to locate Holscher and advise him that someone had propped open the spring-loaded valve resulting in a red acid spill in the sabre room. Holscher responded by saying: "Oh shit." Berglund and Holscher quickly walked back to the sabre room, and en route Holscher repeatedly expressed his concern that he would lose his job over the incident. They arrived at the sabre room about four to five minutes later to find that the acid was no longer flowing into the barrel and onto the floor.

[¶19.] According to Berglund, by this time the odor of acid was much stronger so he suggested to Holscher that they ventilate the building by opening doors, shutting down the exhaust fans and turning up the intake fans to evacuate the odor. Berglund left the sabre room and proceeded to open doors and turn on fans in

order to ventilate the area. Berglund then left the area and returned to his duties in the laboratory.

[¶20.] Holscher proceeded to the shower room where he encountered Rieger who had sustained minor chemical burns to his left foot due to a small hole in his rubber boots. As Rieger passed Holscher in the locker room, Rieger observed him putting on a pair of rubber boots. Holscher stated that he had "really screwed up," to which Rieger replied: "Yes, you did."

[¶21.] Holscher returned to the sabre room and entered at least twice in failed attempts to remove the plug from the floor drain. Holscher then retrieved a small pump from the control room and attempted to suction the acid from the floor into a barrel. At approximately 8:45 p.m., thirty minutes after the spill was discovered, Holscher returned to the control room and asked Berglund if he knew where to find a respirator. Holscher had never received training on respirators but had used one prior to that day due to ammonia fumes created in the production processes at the plant. Berglund told Holscher to locate maintenance as they had been trained on how to use respirators. Holscher located Doug Mertens (Mertens), a Valley Queen maintenance worker, in the lunch room and asked about a respirator. Mertens and Holscher went to the mechanical room where Mertens located a respirator and handed it to Holscher without assembling it. Mertens then left for the maintenance shop to retrieve his respirator in order to assist in the sabre room cleanup. Mertens next saw Holscher near the lab, and Holscher told Mertens that his respirator was not working and handed it to Mertens. Mertens noted that the respirator was assembled incorrectly and was missing the canisters. Mertens reassembled the respirator and attached the canisters.

[¶22.] The two men then proceeded to the sabre room and, without entering, attempted to use the small pump to force the liquid on the floor into an empty barrel. The pumping was not effective, and Holscher and Mertens decided to retrieve a larger pump from across the street. However, Holscher changed his mind as he felt there was not enough time to retrieve another pump as a purple haze had begun to form in the sabre room. He then decided that he should try to force the plug from the drain. Holscher obtained a crow bar from the mechanical room, entered the sabre room, and was able to use it to push the plug from the drain. Mertens observed Holscher was in the sabre room attempting to manipulate the plug for approximately five minutes before succeeding. Mertens never entered the sabre room.

[¶23.] Finally, at 9:00 p.m., after Holscher had removed the plug from the sabre room floor, he telephoned his immediate supervisor Brad Snaza, (Snaza). Snaza told Holscher to keep everyone out of the sabre room. Snaza arrived within five to six minutes and, when he entered the sabre room, he found Holscher hosing down the floor and that there was no red acid pooled on the floor. Snaza then met with Holscher about the chemical spill. Holscher estimated that forty to fifty gallons of red acid had overflowed onto the floor of the sabre room and that it was a major chemical spill. Holscher repeatedly expressed concern over losing his job during the conversation.

[¶24.] Holscher sustained a respiratory injury from inhaling hazardous chlorine gas vapors. He eventually had to undergo surgery to insert an artificial trachea, and at the time of the hearing it was unknown if he would ever be able to

return to any type of work due to his poor lung capacity. Holscher also sustained chemical burns from contact with the red acid on one of his feet and on his hands.

[¶25.] Holscher filed a workers' compensation claim, which Valley Queen denied. He then filed a petition for a hearing before an ALJ. Valley Queen filed its answer contending Holscher's claim was barred by SDCL 62-4-37 due to his willful misconduct. The parties agreed to bifurcate the claim and a hearing was held on the matter of Holscher's willful misconduct.

[¶26.] The ALJ found that Holscher's failure to use a safety appliance constituted willful misconduct within the meaning of SDCL 62-4-37. In addition, the ALJ found that Holscher violated safety rules when he failed to call a supervisor after a major chemical spill per the evacuation plan and per the chemical spill policy enforced by Valley Queen. The ALJ also found Holscher violated safety rules when he failed to consult and follow the procedures on the MSDSs for red acid and other chemicals located in the sabre room. Finally, the ALJ found Holscher's willful misconduct in failing to use the safety device was a substantial factor in causing the chemical spill and his injuries, and denied his claim.

[¶27.] Holscher appealed the ALJ's decision to the Secretary, and the decision was affirmed. Holscher then appealed to circuit court, which affirmed the Secretary's decision. Holscher appeals the circuit court's final judgment to this Court raising the following issues:

> 1. Whether Valley Queen presented sufficient evidence to support the Department's ruling that the spring-loaded valve was a safety appliance furnished by the employer within the meaning of SDCL 62-4-37.

2. Whether Valley Queen presented sufficient evidence to support the Department's ruling that Holscher was barred from receiving workers' compensation benefits pursuant to SDCL 62-4-37, for engaging in willful misconduct.

3. Whether the application of SDCL 62-4-37 returns principles of negligence to the workers' compensation statutory scheme such that it is necessary to weigh the conduct of the employer before limiting an employee's right to recovery.

## STANDARD OF REVIEW

[¶28.] This Court's standard of review for administrative agency decisions is well settled and governed by SDCL 1-26-37, which provides in relevant part that on review we "shall give the same deference to the findings of fact, conclusions of law, and final judgment of the circuit court as [given] to other appeals from the circuit court. Such appeal may not be considered de novo." However, if the issue is a question of law, the Department's actions are fully reviewable by this Court under the de novo standard. Fenner v. Trimac Transp., Inc., 1996 SD 121, ¶7, 554 NW2d 485, 487 (quoting Helms v. Lynn's Inc., 1996 SD 8, ¶¶9-10, 542 NW2d 764, 766).

[¶29.] "Issues of causation in worker's compensation cases are factual issues that are best determined by the Department." Therkildsen v. Fisher Beverage, 1996 SD 39, ¶8, 545 NW2d 834, 836 (quoting Lawler v. Windmill Restaurant, 435 NW2d 708, 709 (SD 1989)). When reviewing findings of fact we apply the clearly erroneous standard of review, giving great weight to the agency's findings and inferences drawn on questions of fact.[1] Id. "However, 'we review findings based on

---

1. Some confusion may still exist among the bench and Bar as to the appropriate standard of review for an administrative agency's findings of fact. This Court, in *Sopko v. C & R Transfer Co.*, 1998 SD 8, ¶7, 575 NW2d 225, 228-29, abandoned use of the "substantial evidence" standard of review

(continued . . .)

#23657

deposition testimony and documentary evidence under the de novo standard of review.'" Mudlin v. Hills Materials Co., 2005 SD 64, ¶5, 698 NW2d 67, 71 (quoting Grauel v. South Dakota School of Mines and Technology, 2000 SD 145, ¶7, 619 NW2d 260, 262) (citation omitted).

**ANALYSIS AND DECISION**

[¶30.]     **1.     Whether sufficient evidence was presented by Valley Queen to support the Department's ruling that the spring-loaded valve was a safety appliance furnished by the employer within the meaning of SDCL 62-4-37.**

[¶31.]     Holscher argues that the Department erred when it determined that the spring-loaded valve was a safety appliance furnished by the employer within the meaning of SDCL 62-4-37. He relies on case law from Louisiana for the proposition that an appliance furnished by an employer may only be considered a safety appliance when it is "provided by the employer principally as a safety or protection for the employee." *See* Kagar v. Chashoudian, 432 So2d 982, 983 (LaApp 1983). Holscher argues that the spring-loaded valve's primary purpose was to

_____

(. . . continued)

> in favor of the clearly erroneous standard and provided an in-depth analysis of the two standards and how they differ. However, legal publishers have not consistently noted that our cases published prior to *Sopko* that use the "substantial evidence" test are no longer good law. *E.g.,* Kester v. Colonial Manor of Custer, 1997 SD 127, ¶16, 571 NW2d 376, 380; Zoss v. United Bldg. Centers, Inc., 1997 SD 93, ¶6, 566 NW2d 840, 843. Because legal publishers have not reflected this change, the "substantial evidence" standard occasionally appears in briefs before this Court, and has appeared at least once in an opinion since 1998. *See* South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exchange, 1999 SD 2, ¶25, 589 NW2d 206, 211.

-12-

prevent chemicals from entering the city sewer system and to prevent the wasting of chemicals.

[¶32.] SDCL 62-4-37 provides:

> No compensation shall be allowed for any injury or death due to the employee's willful misconduct, including intentional self-inflicted injury, intoxication, illegal use of any schedule I or schedule II drug, or willful failure or refusal to use a *safety appliance furnished by the employer*, or to perform a duty required by statute. The burden of proof under this section shall be on the defendant employer.

(emphasis added). No definition is provided within the code for the term "safety appliance." Nor has this Court had occasion to review when a device qualifies as a "safety appliance" within the meaning of SDCL 62-4-37.

[¶33.] "Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." Martinmaas v. Engelmann, 2000 SD 85, ¶49, 612 NW2d 600, 611. Therefore, we must examine the plain meaning of the words "safety appliance" in SDCL 62-4-37.

[¶34.] Safety is defined as "[t]he condition of being safe; freedom from danger, risk, or injury." American Heritage College Dictionary 1199 (3rd ed 1997). Appliance is defined as "[a] device that performs a specific function." *Id.* at 66. Thus, the two words used together suggest as a definition: a device that performs a specific function that prevents danger, risk or injury. A "safety device" under SDCL 62-4-37 is a device that performs a specific function that prevents danger, risk or injury and that is "furnished by the employer."

[¶35.] The language of the statute does not imply that the main or primary purpose of the appliance must be for safety. The plain meaning suggests that the appliance must serve the specific function of preventing danger, risk or injury but not to the exclusion of all other purposes. Holscher attempts to graft "primary purpose" on to the statutory language in SDCL 62-4-37. Our rules of statutory construction do not permit such an interpretation. Because the plain meaning of the language in SDCL 62-4-37 is clear, we do not need to resort to case law, much less case law from another jurisdiction, in order to ascertain its meaning.

[¶36.] Supervisor Lance Johnson testified at the hearing before the ALJ that the spring-loaded valve was furnished by the employer with the purpose of providing for employee safety, preventing chemical spills, and preventing waste. Johnson's testimony that the valve was furnished by the employer for employee safety is supported by the employee safety training conducted by Valley Queen. The training emphasized the importance of not mixing acids and chlorine, the danger from vapors that would result if the chemicals were mixed, and the hazardous properties of red acid generally. Consequently, it indicated that the spring-loaded valve was furnished by the employer in order to control the flow of red acid and to avoid spills that could injure employees. The safety purpose of the valve is also supported by the training and rule regarding how and by whom red acid could be dispensed.

[¶37.] The Department found that the purpose of the spring-loaded valve was to prevent chemical spills that would present a danger to employees. The evidence supports Valley Queen's position that it furnished the spring-loaded valve in order to limit the number of persons who could dispense red acid into the barrel, to

require that a person maintain control over the dispensing so that any spills could be quickly identified, and to safely handle the chemicals using the appropriate method as specified on the relevant MSDS. Therefore, the Department found the spring-loaded valve was a safety appliance furnished by the employer within the meaning of SDCL 62-4-37.

[¶38.] Holscher argues that preventing spills is a purpose separate and distinct from protecting employees. He contends that spill prevention is geared toward preventing chemicals from entering into the City of Milbank sewer system and preventing the wasting of chemicals. He also contends that because spring-loaded valves are used in other locations in the plant to control the flow of other chemicals as they are added into the production process, the primary purpose of the spring-loaded valve on the acid barrel in the sabre room cannot be for the protection of employees.

[¶39.] Holscher's argument that the primary purpose of the spring-loaded valve was to prevent chemical spills from entering the city sewer system is unsupported in the record. The evidence indicates that the floor plug and containment system below the floor served to prevent spills from entering the city sewer system. The proper operation of the spring-loaded valve would prevent chemical spills on the floor that might enter the containment system, but once that system was operational the chemicals could not enter the sewer system. Yet, Valley Queen continued to maintain the spring-loaded valve and relevant work place safety rules in order to prevent red acid spills in the sabre room. The evidence supports Valley Queen's position that the spring-loaded valve was furnished by the

employer to prevent chemical spills inside the sabre room and to protect employees from the potentially hazardous consequences of such a spill.

[¶40.] Holscher's further argument that the spring-loaded valve primarily served to prevent the wasting of chemicals rather than a safety purpose is also not supported by the record. A supervisor indicated that the prevention of waste is one purpose of the valve, but nowhere in the record is this offered as a primary or sole purpose of the valve.

[¶41.] Holscher's next argument concerning the purpose for other spring-loaded valves in other locations in the plant also lacks merit. Holscher cites to a Tennessee case holding that the proper analysis of the purpose of a safety appliance requires an examination of the context in which the device was used by the employee, rather than examining the device itself or uses for the device other than the use at the time of the injury. *See* Nashville, C & St. L. Ry. v. Coleman, 269 SW 919, 920 (Tenn 1925). Therefore, reviewing the use of the spring-loaded valve in areas other than the sabre room would not comport with Holscher's proposition that the device must be examined in the context in which it was used or should have been used when the employee was injured.

[¶42.] Finally, Holscher contends that failing to limit the rule to devices that are used primarily for safety would create a loophole in the law that would allow employers to escape liability for work place injuries as long as a safety purpose, no matter how insignificant, was alleged. He argues that devices such as floor mats that keep floors clean but also provide a safety benefit, brightly colored shirts that identify employees and have the added benefit of protecting employees from

motorists in the parking lot, rounded desk corners, lighting, and all manner of equipment would qualify and defeat the underlying purpose of the workers' compensation statutory scheme.

[¶43.]     However, Holscher fails to note that claiming a safety purpose alone does not serve as a talisman for the employer to deny a workers' compensation claim. *See* 2 Arthur Larson, Larson's Workers' Compensation Law § 35.02 (2004) (noting that an employer may not escape liability by merely posting written rules forbidding a potentially injurious practice). The analysis of an employer's claim of willful misconduct requires much more that the claimed existence of a safety appliance. First, the employer must prove that the safety appliance was furnished by the employer. SDCL 62-4-37. Next, the employer must prove that the employee's failure to use the safety appliance was willful. *Id.* Finally, the employer must prove by a preponderance of the evidence that willful failure to use the safety appliance was the proximate cause of the employee's injury. Cavender v. Bodily, Inc., 1996 SD 74, ¶19, 550 NW2d 85, 89 (citing SDCL 62-4-37; Driscoll v. Great Plains Mktg. Co., 332 NW2d 478 (SD 1982) ("equating 'due to' in SDCL 62-4-37 with 'proximate cause' under negligence law")).

[¶44.]     The Department did not err when it found that the spring-loaded valve was a safety appliance furnished by the employer within the meaning of SDCL 62-4-37. While there is evidence to support Holscher's contention that other purposes were served by the valve, South Dakota law does not require an exclusive safety purpose for an appliance before an employer can claim willful misconduct under SDCL 62-4-37 as a bar to workers' compensation benefits. Therefore, the

Department's finding of fact that the spring-loaded valve was a safety appliance within the meaning of SDCL 62-4-37 was not clearly erroneous.

[¶45.] **2. Whether Valley Queen presented sufficient evidence to support the Department's ruling that Holscher was barred from receiving workers' compensation benefits pursuant to SDCL 62-4-37, for engaging in willful misconduct.**

[¶46.] The ALJ found that Valley Queen presented sufficient facts to prove by a preponderance of the evidence that Holscher engaged in willful misconduct, in that he made a conscious decision not to use a safety appliance furnished by the employer when he disengaged the spring-loaded valve. The ALJ also found that Holscher violated additional safety rules concerning major chemical spills, the evacuation plan and the use of MSDSs.

[¶47.] The parties stipulated to the fact that Holscher knew his act of propping open the spring-loaded valve and leaving the acid barrel unattended was a violation of posted Valley Queen policies, and that he had prior knowledge of the specific policies he violated on October 1, 2003. The parties further stipulated that Holscher knew that a plug had been placed in the drain in the sabre room prior to October 1, 2003, and that Valley Queen did not have gas masks available in the sabre room. It is also undisputed in the record that Holscher knew that red acid could cause skin burns, and in combination with chlorine could cause hazardous vapors or gas.

[¶48.] SDCL 62-4-37 places the burden on the employer to prove that an employee committed "willful misconduct" and that the injury was incurred "due to" the employee's willful misconduct. Wells v. Howe Heating & Plumbing, Inc., 2004 SD 37, ¶10, 677 NW2d 586, 590 (citing Goebel v. Warner Transp., 2000 SD 79, ¶13,

612 NW2d 18, 22).  The language "willful misconduct" in SDCL 62-4-37,

contemplates conduct that "constitute[s] serious, deliberate, and intentional

misconduct."  Phillips v. John Morrell & Co., 484 NW2d 527, 532 (SD 1992).[2]

---

2.    We recently noted in *Mudlin*:

> The term "willful misconduct" has long been defined in this state as "something more than ordinary negligence but less than deliberate or intentional conduct.  Conduct is gross, willful, wanton, or reckless when a person acts or fails to act, with a conscious realization that injury is a *probable,* as distinguished from a *possible* (ordinary negligence), result of such conduct."  Fenner v. Trimac Transportation, Inc., 1996 SD 121, ¶9, 554 NW2d 485, 487 (citing VerBouwens v. Hamm Wood Products, 334 NW2d 874, 876 (SD 1983)).

2005 SD 65, ¶28, 698 NW2d 67, 76.  The definition of willful misconduct used in *Mudlin* was taken from *Fenner* and *VerBouwens*, which in turn relied upon the definition used in *Granflaten v. Rohde*, 66 SD 335, 339-40, 283 NW2d 153, 155 (1938).  Although *Granflaten* was a case dealing with South Dakota's guest statute, a subject unrelated to our workers' compensation statutory scheme, it correctly defined the concept of willful misconduct under tort law.  *Granflaten*, 66 SD at 339-40, 283 NW2d at 155.

However, the language in the *Granflaten* definition was altered in *Fenner* and *VerBouwens* to "something more than ordinary negligence but less than deliberate or intentional conduct."  The original language in *Granflaten* stated:

> The conduct within the meaning of the statute must be something more than negligence or failure to exercise ordinary care.  In *Melby v. Anderson*, 64 SD 249, 266 NW 135, the meaning of "gross negligence or willful and wanton misconduct" [page 136] is expressed in the following language:  "The words 'gross negligence' are, for practical purposes, substantially synonymous with the phrase 'willful and wanton misconduct.'  Willful and wanton misconduct (and gross negligence as it is employed in this statute) means something more than negligence.  They describe conduct which transcends negligence and is different in kind and characteristics. They describe conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong.

(continued . . .)

Willful misconduct under the workers' compensation statutory scheme

"contemplates the intentional doing of something with the knowledge that it is

likely to result in serious injuries, or with reckless disregard of its probable

consequences." *Fenner*, 1996 SD 121, ¶9, 554 NW2d at 487-88 (quoting Black's Law

Dictionary, 6th ed. at 1600 (1990)).

[¶49.]      A four-part test is used to determine whether an employee's violation

of workplace safety rules constitutes willful misconduct.  2 Larson's Workers'

Compensation Law § 35.01.  The same four-part test is applied to cases involving

the failure to use a safety appliance furnished by the employer.[3]  *Id.*  The four-part

test requires that:  (1) the employee must have actual knowledge of the rule or

---

(. . . continued)

> *Id.  Fenner* and *VerBouwens* are overruled to the extent of the alteration of the definition of "willful misconduct" to "but less than deliberate or intentional conduct."  Willful misconduct for purposes of the workers' compensation statutory scheme is defined as conduct that "constitute[s] serious, deliberate, and intentional misconduct."  *Phillips*, 484 NW2d at 532.

3.    Jurisdictions that have enacted similar safety rule statutes generally fall into two categories.  Alabama, Florida, Georgia, Idaho, Indiana, Kentucky, South Carolina and Virginia permit an employer to use the safety rule defense with regard to an employee who fails to follow safety rules or who fails to use a safety appliance furnished by the employer.  2 Larson's Workers' Compensation Law § 35.01 n1 (citing Ala Code §§ 25-5-31, 25-5-51; Fla Stat Ann § 440.09.5; Ga Code Ann § 34-9-17; Idaho Code Ann § 72-442; Ind Code § 22-3-2.8; Ky Rev Stat Ann § 342.165; SC Code Ann § 42-11-100.1; Va Code Ann § 65.2-306)).  A second group of jurisdictions that includes Delaware, Kansas, Louisiana, Oklahoma, Tennessee and Vermont, permit the defense only when an employee fails to use a safety appliance furnished by the employer.  2 Larson's Workers' Compensation Law § 35.01 n2 (citing Del Code Ann tit 19 § 2353; Kan Stat Ann § 44-501; La Rev Stat Ann § 23:1081; Okla Stat tit 85, § 11; Tenn Code Ann § 50-6-10; Vt Stat Ann tit 21, § 649).  South Dakota has previously been counted among the jurisdictions in the second group, permitting an employer the defense only for an employee's failure to use a safety appliance.  *Id.*

appliance, and its purpose; (2) the employee must have an actual understanding of the danger involved in the violation of the rule or failure to use the appliance; (3) the rule or use of the appliance must be kept alive by bona fide enforcement by the employer; and (4) the employee had no valid excuse for violating the rule or failing to use the appliance. 2 Larson's Workers' Compensation Law § 35.01 - .04.

[¶50.]     In the instant case, Valley Queen entered evidence into the record that it provided the spring-loaded valve as a safety appliance to prevent spills of red acid and to promote employee safety. It also entered into evidence that Holscher attended safety training sessions where the use and purpose of the spring-loaded valve was reviewed, and that the "supervisor only" rule had been posted in the sabre room prior to the date of the accident. Holscher's attendance at training sessions is documented, and he admitted in his testimony that he knew of the policy.

[¶51.]     Training sessions attended by Holscher also indicate that he knew and understood the dangers presented by red acid, as the skin injuries and inhalation injuries caused by red acid were reviewed at those sessions. It is also clear from the content of the training sessions that Holscher had actual knowledge of the presence of chlorine-based chemicals in the sabre room, and that these two chemicals could come into contact with each other in the sabre room. Holscher's testimony further supports the ALJ's finding that he knew and appreciated the danger of skin contact with red acid, as Holscher retrieved rubber boots and used a pallet to stand on while attempting to remove the floor drain plug. The record clearly supports an inference that Holscher understood the danger of vapors from mixing red acid and

chlorine, as he attempted to ventilate the building after the chemical spill and also attempted to use a respirator in order to protect him from the hazardous vapors.

[¶52.]    Next, Valley Queen established via testimony from Johnson that Holscher had received an oral reprimand for propping open the spring-loaded valve just two weeks prior to the October 1, 2003 chemical spill.  He was further cautioned that such violations could result in a chemical spill and disciplinary action up to and including discharge.  There is also evidence in the record that Holscher knew and understood that Cardwell had been fired in 2002 for twice failing to use the spring-loaded valve provided by Valley Queen and as it required.  The sign posted by Valley Queen on the acid barrel that articulated the required use of the safety appliance:  "DO NOT PROP OPEN VALVE" was present from the time the policy was instituted until the date and time Holscher's failure to use the spring-loaded valve caused the chemical spill.  Therefore, the ALJ's finding that the rule requiring use of the spring-loaded valve was kept alive by bona fide enforcement by Valley Queen was not clearly erroneous.

[¶53.]    Finally, Holscher presented no evidence to show he had a legitimate reason for failing to use the spring-loaded valve as required by Valley Queen.  His comments to Reiger that he had "really screwed up," show that he knew he had failed to use the spring-loaded valve properly.

[¶54.]    The evidence in the record supports the ALJ's finding that Holscher failed to use a safety appliance provided by his employer, and that his failure constituted willful misconduct within the meaning of SDCL 62-4-37.  Although our standard of review does not require such a determination, the record contains no evidence to support a contrary finding as suggested by Holscher.  Thus, the ALJ's

finding that Holscher failed to use a safety device and that the failure constituted willful misconduct was not clearly erroneous.

[¶55.] In addition to the employer's required showing that the employee engaged in willful misconduct, SDCL 62-4-37 also requires the employer to show that the employee's injury was "due to" the employee's willful misconduct. *Wells*, 2004 SD 37, ¶10, 677 NW2d at 590 (citing Goebel v. Warner Transp., 2000 SD 79, ¶13, 612 NW2d 18, 22). This Court has stated that the language in SDCL 62-4-37, "due to" refers to proximate cause. *Therkildsen*, 1996 SD 39, ¶13, 545 NW2d at 837 (citing *Driscoll*, 322 NW2d at 479). Therefore, an employer will prevail under SDCL 62-4-37 when it shows that the employee's "willful misconduct" was a proximate cause of the claimed injury. *Wells*, 2004 SD 37, ¶10, 677 NW2d at 590 (citing *Cavender*, 1996 SD 74, ¶19, 550 NW2d at 89).

[¶56.] An employee's willful misconduct will be the proximate cause of an injury when it "is a cause that produces [the injury] in a natural and probable sequence and without which the [injury] would not have occurred." Estate of Gaspar v. Vogt, Brown & Merry, 2003 SD 126, ¶6, 670 NW2d 918, 921. However, the employer is not required to show that the employee's misconduct was the only cause of the injury. *Id.* (citing *Estate of Gaspar*, 2003 SD 126, ¶6, 670 NW2d at 921). An injury that may have had several contributing or concurring causes, including willful misconduct, will be barred under SDCL 62-4-37 only when the employee's willful misconduct was a substantial factor in causing the injury. *Cavender*, 1996 SD 74, ¶19, 550 NW2d at 89 (citing *Driscoll*, 322 NW2d at 479-80).

[¶57.] Holscher contends that Valley Queen failed to show his injuries were the foreseeable consequence of his willful misconduct of failing to use the spring-loaded valve properly, and therefore SDCL 62-4-37 does not act as a bar to his workers' compensation claim. He argues that unless the precise type of injury he incurred was a foreseeable consequence of his actions, the willful misconduct bar does not apply. He also contends that there were other concurring and contributing causes to his injury without which the injury would not have occurred.

[¶58.] Holscher argues that the floor drain plug and the lack of a respirator in the sabre room on the night of October 1, 2003, were the proximate causes of his injury rather than his failure to use the spring-loaded valve. He argues that if the floor drain plug had not been installed, the red acid would have flowed into the containment system and he would not have had to remove the floor drain plug in order to eliminate the danger to himself and other employees presented by the chlorine gas in the sabre room. In the alternative, Holscher argues that if he had been properly trained on the use of respirators during red acid spills and if a respirator with the correct type of canister would have been available he would have avoided injury. Therefore, Holscher concludes the lack of training and of a properly assembled respirator with the correct type of canister were the proximate cause of his inhalation injury.

[¶59.] Valley Queen entered evidence into the record that the chemical spill caused by Holscher was a "major chemical spill" by his own estimation and admission, in that approximately forty to fifty gallons of red acid flowed onto the sabre room floor. It also entered evidence to show that Holscher's failure to use the spring-loaded valve without propping it open caused the major chemical spill.

Without the chemical spill, Holscher would not have come into contact with such a large volume of red acid and would not have been exposed to the danger of the acid mixing with chlorine or other chemicals present on the sabre room floor.

[¶60.]     While the floor plug may have contributed to Holscher's injury in that it prevented the chemicals from exiting the sabre room, there would not have been forty to fifty gallons of dangerous chemicals on the floor if Holscher had not willfully failed to use the spring-loaded valve and abandoned the filling barrel. Thus, there would have been no need for Holscher to remove the floor drain plug in an effort to eliminate the danger presented by the chlorine vapors.

[¶61.]     Similarly, the lack of respirators in the sabre room and Holscher's lack of training on which canisters to use in the event of a red acid spill also contributed to the injuries suffered by Holscher.  However, there would have been no need for a respirator if Holscher had not willfully failed to use the spring-loaded valve and caused the major chemical spill.  Without his original willful misconduct, there would have been no reason for Holscher to violate the evacuation plan and major chemical spill safety rules.  Nor would entering the sabre room with an improperly assembled respirator have caused any injury to Holscher in the absence of the chemical spill caused by his original willful misconduct.

[¶62.]     Without Holscher's willful misconduct in failing to use the spring-loaded valve on the evening of October 1, 2003, the drain plug and respirator would not have caused any injury to Holscher.  Neither the drain plug nor the respirator presented a danger without Holscher's initial willful misconduct of failing to use a safety appliance furnished by the employer that set the events into motion.

[¶63.]     Valley Queen was not required to show that Holscher's willful misconduct was the only cause of his injury.  Rather, it was required to show that the willful misconduct was a substantial factor in causing the injury.  *See Cavender*, 1996 SD 74, ¶19, 550 NW2d at 89 (citing *Driscoll*, 322 NW2d at 479-80).  Valley Queen showed that Holscher's willful misconduct was a substantial factor in causing his injury.  Therefore, the ALJ did not err when it found that Holscher's willful misconduct was the proximate cause of his injuries.

[¶64.]     **3.     Whether the application of SDCL 62-4-37 returns principles of negligence to the workers' compensation statutory scheme such that it is necessary to weigh the conduct of the employer before limiting an employee's right to recovery.**

[¶65.]     Holscher argues that the application of the willful misconduct exception under SDCL 62-4-37 returns principles of negligence to the workers' compensation scheme.  As such, he urges this Court to hold that it is necessary to weigh the conduct of the employer before limiting an employee's right to recovery under SDCL 62-4-37.

[¶66.]     Holscher's argument lacks merit, as this Court has made it unequivocally clear that the doctrine of negligence has no place in South Dakota's workers' compensation scheme.  *See* Keil v. Nelson, 355 NW2d 525, 530 (SD 1984).  In *Scissons v. City of Rapid City,* we stated:

> Workmen's compensation legislation is based upon the idea that the common law rule of liability for personal injuries incident to the operation of industrial enterprises, based as it is upon the negligence of the employer, with its defenses of contributory negligence, fellow servants' negligence, and assumption of risk, is inapplicable to modern conditions of employment.  Under the compensation acts the theory of negligence as the basis of liability is discarded.

> The general purposes of workmen's compensation legislation, therefore, is the substitution in place of the doubtful contest for a recovery based on proof of the employer's negligence and the absence of the common law defenses of a right for the employees to relief based on the fact of employment, practically automatic and certain, expeditious and independent of proof of fault and for the employers a liability which is limited and determinate.

251 NW2d 681, 686 (SD 1977) (quoting 81 AmJur2d *Workmen's Compensation*, § 2).

The preclusion of a recovery under SDCL 62-4-37 does not herald a return to traditional theories of recovery under negligence as claimed by Holscher. Rather, SDCL 62-4-37 serves as a bar to employees only "in those instances that constitute serious, deliberate, and intentional misconduct." *Phillips*, 484 NW2d at 532.

[¶67.]     Thus, it was not err for the ALJ to refuse to weigh the conduct of Valley Queen to determine if it breached a duty to protect itself from injury. Given the lack of error in the record below, we affirm on all issues.

[¶68.]     SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

[¶69.]     ZINTER, Justice, concurs with a writing.


ZINTER, Justice (concurring).

[¶70.]     Considering the plain language of SDCL 62-4-37, Holscher's proposed construction of the term "safety appliance" does not comport with logic and common sense. What could possibly be more dangerous and more detrimental to employee safety than this type of acid spill in the workplace? The spring-loaded valve was specifically intended to prevent such spills and injuries. If this type of device were not contemplated by the statute, nothing could qualify as a safety appliance. For

the reasons expressed by the Court, the spring-loaded valve was an employer furnished safety appliance within the meaning of the willful misconduct statute.